**UNITED STATES of America**
v.
**W. F. MORGAN & SONS, A Partnership, and Cranston Morgan and Raymond F. Morgan, Individuals.**
Civ. A. 2458–M.

United States District Court
E. D. Virginia,
Richmond Division.
Sept. 12, 1957.

Richard R. Ryder, Asst. U. S. Atty., Richmond, Va., for the United States.

Ammon G. Dunton and William B. McLeod, White Stone, Va., Joshua W. Miles, Baltimore, Md., for defendants.

STERLING HUTCHESON, Chief Judge. (Oral opinion from the Bench.)

I think that I may as well dispose of the matter at this time, gentlemen. We have spent four days listening to evidence. It has been gone into quite fully and, I might add, at times argumentatively, if that is the proper term to apply to the production of proof; in other words, the case has been pretty well argued as we proceeded, I think.

I was interested in knowing of any judicial determinations upon the precise question here presented, but counsel appear to be in agreement that the precise question here involved has not been before the courts, except in a criminal case before Judge Coleman which resulted in an acquittal.

As I view the situation before the Court—and my remarks are intended to be brief and they will probably be rather sketchy—the Government is seeking an injunction to enjoin the defendants from violating regulations pertaining to the packing of "shelled oysters, thoroughly drained," I believe is the appropriate designation.

The regulation has two alternate methods for draining. One is the use of certain equipment referred to in the regulation, draining on a strainer or skimmer there described for a specified period of time, namely, not less than five min-utes, or, as an alternative, the oysters may be drained by any other method whereby liquid is removed so that when the oysters are tested within fifteen minutes after packing not more than five percent liquid by weight remains. As I understand, they are the Standards of Identity, I believe they are called, spelled out in the regulation.

Now, the charge is that the defendants, over a period of years, have violated the regulation, specifically, that excess liquid of more than five percent remained within fifteen minutes after packing, or that they have not complied with the first method provided. There is no contention made that they have proceeded under the method designated as Section 36.10, Subsection 2(i). The following subsection, designated (ii), relates to the test within fifteen minutes after packing.

The Government has introduced no proof to show that these oysters contained more than five percent excess liquid within fifteen minutes after packing, but to prove that, they rely upon the proposition that these particular oysters do not comply with the excess liquid requirement and, therefore, when the oysters are tested at any period after packing and found to contain in excess of five percent free liquid, it follows that the excess was present within fifteen minutes after packing. That is the proposition as I understand it.

The second matter involved relates to what is known as soaking oysters by washing, blowing, or otherwise. That is spelled out in Section 36.10(b). There is no direct evidence with respect to these particular oysters having been washed or blown an excessive time. I believe there is testimony to the effect that on some occasions in the past inspectors have observed that being done, but so far as this case is concerned the Government relies upon the fact that in some of these instances less total solids than 10.4 percent was found in the cans, it being the contention of the Government that less than 10.4 percent total solids in the oysters is proof that the oysters were washed or blown an excessive amount of time.

In support of this contention, we have heard a lot of evidence from gentlemen who have had a great deal of experience. I am confronted, first, by something which still puzzles me, and that is the statement in the findings of fact of the Food and Drug Administration that all oysters exude some fluid after removal from the shell; this is called "bleeding." The paragraph concludes, "If oysters are washed, drained, and packed while still bleeding, liquid will appear in the container in which packed, giving the appearance of inadequate drainage." That finding of fact, filed in August 1947, is still official, as I understand.

The Government introduces the findings of Messrs. Daughters and Hoshall in which they state their conclusion that, based upon seven authentic packs, their findings "conclusively disprove any claim that Chesapeake Bay area oysters bleed or leak during standing, handling, and shipping, with a consequent increase in drained liquid content." I am puzzled to know why the Food and Drug Administration, basing their case as they do largely upon this determination, have not amended the findings of fact. However, as Judge Coleman pointed out in the case mentioned awhile ago, it would be presumptuous upon my part to tell them what to do, but it leaves a question in my mind which has not been answered yet.

Now, so much for the drainage, before referring to the testimony.

On the second proposition, concerning the oversoaking or blowing, I turn again to the findings of fact, Paragraph 17: "Shucked oysters placed in contact with water of a higher degree of salinity than the water in which they were grown shrink, and when placed in water of a lower salinity there is absorption of water, increasing as the salinity decreases." Then, here is this sentence: "There is no known formula by which the amount of shrinkage or absorption can be determined." Still, the Government contends that the low total solids content is proof—or that there is a formula by which the absorption can be determin-

ed. There again is a finding of fact by the Food and Drug Administration which I am asked to find against. I do not know how much significance to attach to those findings, but I confess they have some influence on my thinking.

Coming to the evidence, eminent gentlemen have testified for both the Government and the defendants. I shall not undertake to review the testimony of the different witnesses, but there has been quite an impressive gathering of scientists in the court room for the four days the hearing has consumed. The tests of Mr. Hoshall, I am sure, were carefully made and a number of chemists have testified in behalf of the Government in support of those tests. There has been an equally impressive array of scientists testifying to the contrary concerning this matter of total solids and free liquid content, representing, from the Government, the Fish and Wild Life Service, the Shellfish Division, I believe it is; from Johns-Hopkins University, the State of Virginia, the Oyster Institute of North America, and a number of others. Their testimony, as I understood it as delivered from the stand, is to the effect that: First, information is limited but oysters from the Chesapeake Bay area do bleed—some of them do not, some of them do—and bleeding is greater at some seasons of the year, varying with condition of the oysters, the month in which taken, and I believe one or two of the gentlemen testified that they vary somewhat from year to year.

I might mention in passing that these gentlemen have had long experience, most of them. I believe Mr. Siegel testified that he had been studying oysters for about thirty years, and due to experience he has reached a conclusion somewhat different from the one he had about ten or twelve years ago. There were others who have had an equal length of time and experience. Mr. Weaver, from Froehling & Robertson, has had long experience in working with oysters. Those witnesses, as I understood their testimony, are pretty well in agreement, first, that there is too little information

for them to base a satisfactory conclusion upon and, secondly, that there is a variation in the bleeding tendency of oysters; there is a serious question with respect to the relation of total solids to bleeding or washing. I will confess I did not know that oysters are such temperamental creatures until I heard the testimony in this case.

It is also pretty clear, I think, that there is no agreement among the scientists for the respective sides, the Government and the defense. There is testimony from both sides, directly conflicting, but to me, as a layman, it seems that the existence of satisfactory proof is quite doubtful.

██ An injunction is a harsh remedy, as we all know, and to be used only when fully justified. The Hecht Case, Hecht Co. v. Bowles, 321 U.S. 321, 64 S. Ct. 587, 88 L.Ed. 754, I believe, is the leading case upon the subject, laying down the principles justifying a court in granting an injunction. In that connection, I have in mind the fact of the change of ownership and management of the business in 1953, the employment of Froehling & Robertson, their present employment, and the present conditions at the plant, including the new equipment which has been purchased, all of which, I think should be taken into consideration. But I have this in mind: that if an injunction were granted enjoining the defendants from misbranding with respect to drained liquids and you were to come into court on a contempt citation and had the same evidence before me that you have in this case seeking an injunction, I would be sorely pressed to know what to do, with the disagreement between the scientists, able scientists, concerning their conclusions, bolstered by the fact that current studies are being made with a view of obtaining further information, and being made by the Federal Government itself. It would seem this is a recognition of the fact that the needed information is not complete. I would feel reluctant to convict on the basis of this type of proof on

a contempt charge. The same observations apply to such a citation involving a charge of a violation respecting an alleged deficiency of total solids. It would appear that a reasonable yardstick to use in passing upon an application for such an injunction would be a consideration of what the proof would justify if a violation of the injunction should be later alleged, based upon a similar set of facts.

There is a third ground here, concerning shortage in volume. That, of course, stands in an entirely different situation. If there were persistent shortages in the volume of the cans, that is something that could be determined by weight; there is no difficulty about determining that. But the explanation concerning the defective operation, until corrected, of the new can filler and the absence of any complaint since then, I think, takes from it any significance so far as this proceeding is concerned.

To justify an injunction, of course, previous violations must be shown. I do not think I need discuss the nature of these previous violations that were referred to in the questions of counsel and in the argument. Many of them occurred prior to the change of management. One occurred during a period when the partners were absent due to the death of one parent and the illness of the other. I understand most of them were civil seizures and I know that as a matter of expediency often there is a consent order releasing the property to be rebranded or reworked, and the costs thereby greatly lessened. But this particular issue, involving a determination of facts regarding excess free liquid and allegedly low total solids, based upon the scientific findings of experts, has not been before the courts, as I understand it, except in this criminal case in Baltimore. There is this proof on which the Government elects to rely. I understand it would be difficult for the Government to have somebody there to check every fifteen minutes, but putting that time limit in the regulation seems to me to have some significance. If the Government is

satisfied oysters do not bleed, that fifteen-minute requirement of the regulation is without meaning.

There was a violation in this court in 1941, as has been pointed out, in which one of the present defendants was fined, jointly with the deceased operator, a total of $20 on a plea of guilty. I have no recollection whatever concerning it, as stated earlier. I have no record of it here before me, and obviously there was no such hearing as we have just been through. That was in 1941 and the Daughters and Hoshall tests were made in 1953. I pointed awhile ago to the change in ownership. With relation to the charges and to seizures for mis-branding, previous violations have been admitted.

The second matter to be considered is the probability of future violations. They, generally speaking, are the matters to be considered by the Court. If it were a question of volume, as I said awhile ago, it would be very different from the question which we have here. The issues here are so involved by lack of information, I feel that if I had a contempt citation before me with the same type of evidence and it were contested, I would have very serious doubt as to what I should do, until further information is known concerning the behavior of oysters. Furthermore, the apparent attitude of the present management as evidenced by the purchase of new equipment and general plant improvement, the employment of and apparent cooperation with a firm of recognized chemists, and recently acquired membership in an important association of the industry, lead me to believe they do not intend to commit violations. As I understand, these took place since the 1953 seizures and, in part at least, prior to the 1956 seizures. Another circumstance worthy of mention is that they have not lost as customers two large concerns both of which have their own chemists to check upon the oysters received.

■ In view of what has been said—and I have gone into it probably more fully and ramblingly than I intended at the beginning—I do not feel that the Government has made out a case which would justify an injunction and, therefore, I deny the application.